UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JUANDISHA SAPP, <br><br> Plaintiff <br><br> vs. <br><br> THE CITY OF NEW YORK, NEW YORK CITY POLICE DEPARTMENT ("NYPD") OFFICER ANDREW GIARDINO, NYPD OFFICER JOSEPH WAZNER, NYPD OFFICER NIURKY LAVIGAT, NYPD SERGEANT CARMEN JAYCOX, NYPD LIEUTENANT JOHN TRATTA, NYPD'S ROBERT FODERA, EMERGENCY MEDICAL SERVICE ("EMS") EMT PATRICK GUSTAMA, ADMINSTRATION FOR CHILDREN SERVICES ("ACS") SUPERVISOR KATHY BLY, ACS' NATALIA RICHARDS, ACS' DAMIEN SELLERS, ST. BARNABAS HOSPITAL, JOHN DOES 1-10 <br><br> Defendants. | Case No: 24-cv-645 <br><br><br> **COMPLAINT** <br><br><br> DEMAND FOR JURY TRIAL |

Plaintiff, by and through her undersigned attorney, alleges as follows:

**NATURE OF THE ACTION**

1.  Plaintiff brings this action for compensatory damages, punitive damages, and attorney's fees pursuant to 42 U.S.C. § 1983, 42 U.S.C. § 1985, 42 U.S.C. § 1988 for violation of her civil rights under 42 U.S.C. § 1983, and § 1985, and the First, Fourth and Fourteenth Amendments to the United States Constitution.

2. As described herein, Ms. Juandisha Sapp is a black single mom who loves her kids immensely and was living with her three children, ages 9, 7, and 2, in the Bronx.  During COVID, in January 2021, in 18 degree weather, while Ms. Sapp was leaving the grocery store with her three children, her phone ran out of battery.   She could not access her cash

application on her phone (e.g. CashApp), or her car service applications (e.g. Uber, Lyft) to go home.  She tried to find a cab. None were available.  Police did not help her either.  She was antagonized by them, and then detained.  Ms. Sapp was not permitted to leave to go home, but rather, made to go the hospital through manipulation and force, taken into custody with her three children, and hospitalized.  Importantly, because there was no legitimate reason for the Fourth Amendment violation, Defendants covered up their unlawful arrest and taking of Ms. Sapp to the hospital by making knowingly false allegations that Ms. Sapp had neglected her children by erratically walking her children around the community in 5 degree weather without winter coats, falsely creating and filing a domestic incident report alleging Ms. Sapp's nine year old daughter complained of abuse, falsely alleging Ms. Sapp had been trying to commit several felonies stealing cars, and finally cherry picking wholly unrelated context lacking statements by Ms. Sapp made in the course of her 20 minute calm conversation with Officers asking if they can help her get her phone charged or call her a ride.  Finally, such actions led to the hospitalization of Ms. Sapp, and ACS action that resulted in Ms. Sapp having to spend three years trying to reunite with her children.  All of this, because Defendants herein lied to cover up their wrongdoing, and then failed to provide evidence from of Body Worn Camera ("BWC") footage of the incident in response to a subpoena from the family court proceedings, that would have exonerated Ms. Sapp.  As a result of this egregious conduct, and City policy, complicity, and violations, Plaintiff has not only suffered great pain and mental distress, but she is still trapped in a labyrinth of city agencies that have forced her to be monitored, medicated, and kept her separated from her children.

## JURISDICTION

3.   The Court has jurisdiction over Plaintiff's federal law claims under 28 U.S.C §§ 1331, 1343(a), (3), and (4), claims and supplemental jurisdiction over Plaintiff's State claims under 28 U.S.C. § 1367(a).

## JURY TRIAL DEMANDED

4.   Plaintiff demands trial by jury of all issues properly triable thereby.

## VENUE

5.   Venue is proper for the United States District Court for the Southern District of New York pursuant to 28 U.S.C. § 1391(b)(1) and (2).

## THE PARTIES

1.    Plaintiff Juandisha Sapp is a resident of the City and State of New York. She is the mother and legal guardian of her three minor children, T.S. (9 years old at time of incident), T.S. (7 years old at time of incident), and N.S. (2 years old at time of incident).

2.   That at all times herein mentioned, Defendant CITY OF NEW YORK (hereinafter "CITY") was and is a municipal corporation, duly organized and existing under and by virtue of the laws of the State of New York.

3.   That at all times herein mentioned, Defendant CITY operated, controlled and maintained a police force known as the New York Police Department ("hereinafter "NYPD"), child welfare force known as Administration of Children's Services ("ACS"), and Emergency medical force known as Emergency Medical Services ("EMS").

4.   That at all times herein mentioned, defendant Officer Andrew Giardino (hereinafter, "Giardino") was and is an NYPD officer employed by defendant CITY.

5.   That at all times herein mentioned, Defendant Giardino was acting within the course and scope of his employment with defendant CITY.

3

6.   That at all times herein mentioned, Defendant Giardino was acting under color of state law.

7.   Defendant Giardino is sued herein in both his individual and official capacities.

8.   That at all times herein mentioned, Defendant Officer Joseph Wazner (hereinafter, "Wazner") was and is an NYPD officer employed by defendant CITY.

9.   That at all times herein mentioned, Defendant Wazner was acting within the course and scope of his employment with Defendant CITY.

10.   That at all times herein mentioned, Defendant Wazner was acting under color of state law.

11.   Defendant Wazner is sued herein in both his individual and official capacities.

12.   That at all times herein mentioned, Defendant Officer Niurky Lavigat (hereinafter, "Lavigat") was and is an NYPD officer employed by defendant CITY.

13.   That at all times herein mentioned, Defendant Lavigat was acting within the course and scope of his employment with Defendant CITY.

14.   That at all times herein mentioned, Defendant Lavigat was acting under color of state law.

15.   Defendant Lavigat is sued herein in both his individual and official capacities.

16.   That at all times herein mentioned, Defendant NYPD Sergeant Carmen Jaycox (hereinafter, "Jaycox") was and is an NYPD supervising officer employed by defendant CITY.

17.   That at all times herein mentioned, Defendant Jaycox was acting within the course and scope of her employment with Defendant CITY.

18.     That at all times herein mentioned, Defendant Jaycox was acting under color of state law.

19.     Defendant Jaycox is sued herein in both his individual and official capacities.

20.     That at all times herein mentioned, Defendant Lieutenant John Tratta (hereinafter, "Tratta") was and is an NYPD supervising officer employed by defendant CITY.

21.     That at all times herein mentioned, Defendant Tratta was acting within the course and scope of his employment with Defendant CITY.

22.     That at all times herein mentioned, Defendant Tratta was acting under color of state law.

23.     Defendant Tratta is sued herein in both his individual and official capacities.

24.     That at all times herein mentioned, Defendant Records Officer Robert Fodera (hereinafter, "Fodera") was and is an NYPD records officer attorney employed by defendant CITY.

25.     That at all times herein mentioned, Defendant Fodera was acting within the course and scope of his employment with Defendant CITY.

26.     That at all times herein mentioned, Defendant Fodera was acting under color of state law.

27.     Defendant Fodera is sued herein in both his individual and official capacities.

28.     That at all times herein mentioned, defendant Administration of Children's Services ("ACS") Supervisor Kathy Bly (hereinafter, "Bly") was and is an ACS supervisor employed by defendant CITY.

29.     That at all times herein mentioned, Defendant Bly was acting within the course and scope of her employment with defendant CITY.

30.     That at all times herein mentioned, Defendant Bly was acting under color of state law.

31.     Defendant Bly is sued herein in both her individual and official capacities.

32.     That at all times herein mentioned, defendant Administration of Children's Services ("ACS") Child Specialist Supervisor Natalia Richards (hereinafter, "Richards") was and is an ACS child specialist employed by defendant CITY.

33.     That at all times herein mentioned, Defendant Richards was acting within the course and scope of her employment with defendant CITY.

34.     That at all times herein mentioned, Defendant Richards was acting under color of state law.

35.     Defendant Richards is sued herein in both her individual and official capacities.

36.     That at all times herein mentioned, defendant Administration of Children's Services ("ACS") Damien Sellers (hereinafter, "Sellers") was and is an ACS worker employed by defendant CITY.

37.     That at all times herein mentioned, Defendant Sellers was acting within the course and scope of his employment with defendant CITY.

38.     That at all times herein mentioned, Defendant Sellers was acting under color of state law.

39.     Defendant Sellers is sued herein in both his individual and official capacities.

40.      That at all times herein mentioned, defendant Emergency Medical Service's ("EMS") Emergency Medical Technician Patrick Gustama (hereinafter, "Gustama") was and is an Emergency Medical Technician employed by defendant CITY.

41.      That at all times herein mentioned, Defendant Gustama was acting within the course and scope of his employment with defendant CITY.

42.      That at all times herein mentioned, Defendant Gustama was acting under color of state law.

43.      Defendant Gustama is sued herein in both his individual and official capacities.

44.      Among such ostensibly "private entities" with and to which the City of New York is inextricably and intertwined and bound is the Defendant St. Barnabas Hospital which provides medical and medical related and health care services (as described hereinafter) for and on behalf of the City of New York and specifically for the New York City ACS and NYPD, including within the services provided to the City of New York forensic investigative services associated with child abuse matters, and also psychiatric evaluations.

45.      Defendant St. Barnabas also provides public functions

46.      Defendant St. Barnabas is a not for profit corporation established pursuant to the laws of the State of New York.

47.      Defendant St. Barnabas and its employees carry out significant, substantial, and important public functions for the ACS; and, as well and inter-related thereto, for the NYPD on behalf of the City of New York.

48.      That at all times herein mentioned, currently unknown and unnamed City of New York, and St. Barnabas unnamed workers (hereinafter, "DOES") was and are City of

New York officers and supervisors employed by defendant CITY, and St. Barnabas who were involved in this incident.

49.     That at all times herein mentioned, defendant DOES were acting within the course and scope of their employment with defendant CITY or St. Barnabas.

50.     That at all times herein mentioned, Defendant DOES were acting under color of state law.

51.     Defendant  DOES are sued herein in both their individual and official capacities.

52.     Each individual defendant had the duty and the opportunity to protect Plaintiff from the unlawful actions of the other individual Defendants, but each individual defendant failed and refused to perform such duty, thereby proximately causing Plaintiff's injuries.

## STATEMENT OF FACTS

6.   On or about January 29, 2021 at approximately 6:00 pm, Plaintiff Juandisha Sapp, a mother, who took very good care of her children, and who, before this encounter, had never been arrested or diagnosed with any mental health disability, was with her three children, aged 9, 7, and 2, around 3611 Kingsbridge Avenue in the Bronx, NY.

7. Ms. Sapp was heading home from grocery shopping and eating in and around BJ's Wholesale Supermarket with her happy and well rested children.  All three were bundled tightly in warm heavy winter jackets, to shield them from the 18 degree Fahrenheit cold in the Bronx.

8.  Ms. Sapp's cellphone had run out of battery and had no charge.

9. Ms. Sapp wanted to get back home with her three children, so she decided to walk to the street to hail a cab.

10.     Due to the cold, or time, or COVID, or all three, Ms. Sapp noticed that all the cabs that were passing her by, were already filled with passengers.

11.     Because her phone had no charge, she could not call for anyone to come, nor use an online car service.

12.     At this time, several Caucasian uniformed police officers approached her. They asked, "What are you doing here this time of night?". She was taken aback by the question, as she thought it was obvious that she was outside the grocery store with her three kids, trying to hail a cab.

13.     She answered, "What are you doing here this time at night?".  At which point she could tell that police officers became aggressive and thought she was being smart with them.

14.      However, Ms. Sapp was genuinely surprised that she was being asked what she was doing.  The Officers continued to question her about what she was doing at 6:00 pm on a Friday night, with her three kids at a grocery plaza.  Plaintiff repeatedly explained she was looking for a cab and could not find one. Rather than the officers helping her to find a cab, or offer to assist her in any way they left after telling her to take a train.

15.     She did not want to take the train, as wait times were longer with COVID, and the train system was not as safe, and it was much easier to take a cab with three children, and it was starting to get colder and later.  She walked away from the officers, and still not finding a cab, went into a nearby Domino's Pizza.

16.     At Domino's Pizza, she asked to use their phone, and when nobody responded, she picked up the phone to call a cab service.  Several minutes later, as she was waiting to either get a charge or the phone, she saw another group of NYPD Defendant officers, who, at the time, she believed were the same ones she had encountered minutes before.

17.     They entered and asked the employees if she had stolen anything from Domino's.  She was offended at the insinuation, and did not understand why they were harassing her.

18.     At this point, Ms. Sapp was concerned that her children would be frightened of all the police surrounding her, she decided to remain calm, and talk casually, and informally, so that she can defuse the situation and let her kids know everything was ok.  She answered jokingly, "What am I going to steal at Domino's?  A pizza box?"  Defendant officers told her she needs to leave Domino's, and she then proceeded to tell them "I want to go home."

19.     There was then an ensuing conversation about how Ms. Sapp's phone was not working because it had no battery, Ms. Sapp explained how her phone had ran out of battery, and she needed a ride, but couldn't find one, and couldn't call one. They asked her where her home was, and she told them her address.  The NYPD Defendant Officers asked if she wanted them to call her a cab.  She replied, "Yes, can you call me one?"  One Defendant Officer replied, "No. I can't call you a cab, I can call you an ambulance.  You can go to the hospital."

20.     They told her they cannot call her a cab, only emergency services.  Ms. Sapp was surprised that the officers said they could not call her a cab, but only emergency services, as she did not need emergency services.  Not really believing that she even qualified for an ambulance, she quizzically replied, "Ok, fine, I will take the ambulance."

21.     Her 7 year old son looks at his mom, eyes wide and laughing, "Mom! We do not need to go to the hospital, we need to go home, are you crazy?!"  Ms. Sapp replied, gently laughing and smiling to her son, "They are just going to keep bothering me.  All I want to do is go home."

22.     It had not only been a few minutes since Defendant Officers entered. Defendant Giardino calls Ms. Sapp an ambulance out of ear shot.

23.     Ms. Sapp sees that he was on his radio and asks, "Did you call me an ambulance?"

24.     Defendant Officer replies, "You said you would take an ambulance."

25.     Ms. Sapp responds, "I was being sarcastic! I don't need an ambulance! I do need a ride home."

26.     "Well, it is too late!" says Defendant Officer.

27.     Another Defendant Officer then asks, "Did you come in here to use the phone to call a cab?  Is that what you were doing [inside of Domino's]?

28.     Ms. Sapp replies, "Yes."

29.     Ms. Sapp then requested to the go the precinct, and use the phone there, if they could at least drive her there.  Defendant Officers responded that they did not want to take her the precinct.

30.     The officers discuss amongst themselves what to do, and Defendant Giardino states, "Let's just take her to the hospital."

31.     While Officers are having a discussion, Ms. Sapp leaves Domino's with her kids to try her luck finding a car again, and to get away from a Defendant Officers, who had not assisted her at all, but had been annoying and harassing her, and would not leave her alone, even though she was not in crisis, nor committing any crime.

32.     Ms. Sapp was actually confused about their motivation for stopping her, and mindful that their questioning was actively starting to worry her children.

33.     Plaintiff walked to the street, and tried to find a ride there.  Police followed her outside. She wanted to get away from them, and when the police were all around her, it made it hard for cars to know what was going on and want to pick her up.

34.     Her kids were getting cold, she walked back to Domino's but the Defendant Officers did not permit her to go back into Domino's.  She was told she had to either get a ride or go to the hospital.

35.     Plaintiff wanted to get a ride, but hadn't found one yet, and having the officers standing around her, was not helpful.  She was clear she either needed to charge her phone, and the police were not assisting with that either, so she went into another store, this time a deli next door, stating, "I am going in here so my kids can be warm, as I find a ride to get home, I am not going to a hospital."

36.     Plaintiff was followed into a deli next door by Defendant Officers.  There, she asked the employee at the deli to please give her a charger so she could use it to call a car to go home.  The deli employee, likely surprised at her entrance trailing along 4 or 5 other officers, appearing unsure about what he was supposed to do and whether she was in police custody, refused to give her a charger or call a cab for her. She looked at Defendant officers, and asked, "I would like for one of you all nice people to please take me home."  At which one Defendant officer replied, "We cannot do that."  Her son asked the Defendant officer, "Why can't you take us into your cop car and drive us home?"

37.     Ms. Sapp asked the employee at the Deli again, one time, "Can you please charge my phone?"  The employee shook his head, and Defendant officers, jumped in antagonistically and in a demeaning manner, "If he doesn't want to charge your phone, he

doesn't have to, ok, and it's a private business.  If he doesn't want you to be in his store, you have to leave!"

38.    Defendant officers proceeded to antagonize Ms. Sapp as she also exchanged annoyed words to the officers who just stood around her as she managed her three young children, the youngest now crying and hitting his mom to pick him up, and the older two children growing concerned about why Defendant Officers were being unkind to their mom.

39.    She picked up her son who had been slapping her leg and tugging at her so she could give him some care and ease his tired little legs from standing.  She picked up her son reiterating that she needed to get home, and her son's diaper had to be changed.  Defendant Officers then yelled, "You cannot change him here".

40.    Nothing she did in any way indicated she was about to change her son there.  She was just stating that was another reason she really wanted to get home. She was startled and noticing a pattern of how everything she did was being interpreted in this oddly dark and twisted way. She was so annoyed that the Officers would not even permit her to put her son on a place to sit so he would not be so tired.  "Maam, maam, you have to get him off the counter!"  Defendant officers atagonized.

41.    While she was holding her son, and to make light of the fact she would have to put him down again, and he would likely have a tantrum as he wanted to be carried or sit, whispered in jest, telling her two year old son who had been hitting her leg, "Slap *him*, slap *him*, get him, no, they not me, they, not me…" While kissing her son in her arms who was sad he was having to stand again.

42.     She stood there with her son is her arms, and off the deli counter as Defendant Officers had directed.  "I am too cute to be sitting in an ambulance, so you all can stop asking me." She joked.

43.     At this point, several other NYPD Defendant Officers, and EMT Defendants arrived at the deli.

44.     NYPD Defendant officers had many chances to assist Ms. Sapp, to let her charge her phone, to help her call a cab, to take some measure to get her home.  Instead, they created a new danger for her, called her an ambulance which she did not need, and which was confusing and intimidating to Ms. Sapp and her kids.

45.     Ms. Sapp was not threatening anyone, did not harm anyone, did not threaten to harm herself or anyone else, was not having a mental health crisis, had committed no crime, had been kept in detention, had been refused the right to walk away, despite not being an Emotionally Disturbed Person or "EDP", and despite not having committed a crime, or having a warrant, or any other justifiable reason for having been stopped, and now, the EMS were walking in, putting on their gloves, and walking up to Ms. Sapp.  When she saw the Defendant EMT walk in she asked, "Please take me home you all."

46.     One Defendant officer stated, "Maybe from the hospital there is a phone you can use." Ms. Sapp responded, "It does not make any sense to do all of that."

47.     During these ten minutes at the Deli, Ms. Sapp, even after the ambulance had already arrived, was calm, leaning against the deli counter, not irate, not yelling, speaking in a normal voice.  She explains to the EMT workers, " I have my period, it has been a long day, I would really like to get home and take a shower." A Defendant officer replies, "If you are going to stay here you will definitely not end up home."  She responds, "I would rather be

here than end up at the hospital and get stranded there." Defendant Officer responds, "But you want to go home." Ms. Sapp calmy- but with curse words, irate and frustrated that she and her kids were were surrounded by police and EMS, said flatly, "Shut the f*** up and call me a ride so I can go home." The Defendant officer responds, "We are not a cab service. We cannot just do that."

48.     She observes that there are now about one dozen NYPD officers and EMS. People outside are starting to peer into the deli. Every reasonable request she has is denied. She is surprised that nobody will just do the exceedingly obvious thing and offer to just charge her phone, or to just give her a ride in the back of a vehicle, or help her hail a cab.

49.     EMT Defendants get cloer to her and state, "We are going to ask you several questions." Ms. Sapp responds, "I do not need to answer your questions. I did not do anything but try to get home.  I just want to get home." EMT Defendants respond, "But you have been going store to store we just want to make sure you are ok." Ms. Sapp clarifies:

50.     "I have been going 'store to store', because its cold outside, and everyone I ask to help me get somewhere they do not want to help. So, since it is cold, I go to the store for cover, duh, doesn't that make sense?"

51.     The EMT defendants respond, "So, let's go to the warm ambulance then." Ms. Sapp calmly explains that she does not need or want an ambulance. "For what? We are not sick. We are not hurt. We are not anything.  There is someone out there that may need a f***ing ambulance and you want to send me, and I do not even need medical services?" The EMT responds, "What area are you going to?" Ms. Sapp replies with her full address.  All of this while her kids are beginning to get restless, while her two year old is asking to be picked up again.

52.     Over one dozen people are just staring at her and her children, but nobody is helping them to charge her phone, or give her a ride, or call her a service.

53.     Ms. Sapp is speaking normally at a conversation level, not yelling, not making any odd movement.  She is collected, but indignant.  "Look, I am not getting upset, but you all just do not make sense to me…if you all just take me to my address, I will be where I need to be."  The Defendant EMTs respond, "Yeah, but we are not a taxi service, we can't take you home, but we can take you closer, and you can go home from there."

54.     Defendant Officer asks, "Do you have money for a taxi?"  Ms. Sapp replies, "If my phone is charged. I have money on my CashApp."  He responds, "Ok, so why don't you let them bring you to the closest hospital to your house, and you can figure it out from there."

55.     As the situation in the deli was getting even more tense, it was now even more clear that not one of the over one dozen City employees there were going to give her a charger to borrow or their phone to call a car service.

56.      Ms. Sapp, tired, but very concerned about her children, decided to herself, that even though the train schedule was not great since COVID and the trains not very safe for her kids, it would be better than the situation they were currently in.  She tells Defendant Officers and EMT she would take the train.  She asked the Defendant Officers to leave, and to give her a minute and she would leave the store, and head to the train, and that they should get to work.  They stated that they are at work and are getting paid to be there.

57.     The NYPD John Doe officers and EMT stated that now that they were involved, that, "We cannot just leave you alone, we have to follow our procedures too." Ms. Sapp says, "Involved what?  Talking to me? Involved what mental health issues?  Ain't nobody got

mental health issues, but you all." A Defendant Officer then states, "Nobody said anything about mental health issues." Ms. Sapp responds annoyed but calm, "Shut up. He just asked me something about, 'are you, is something wrong with your mental health.'"

58.     Ms. Sapp, annoyed and alarmed, told them, she did not want to walk with them to the train station as they had on their NYPD uniforms. Ms. Sapp did not feel comfortable walking on the train, being escorted by all of the police officers in public. She did not think it was safe for her and the children, and it would be very embarrassing for them.

59.     Defendants told her she only has two options, go to the train with the police, and they would pay for her to get on the train, or to go to the ambulance and get closer to her house.

60.     Ms. Sapp asked her kids what they would like to do. Her older daughter said she would like to take the ambulance.

61.     The EMT Defendants stated, "We cannot just leave you be, unfortunately."

62.     Ms. Sapp then turns her back to Defendants, and states they are just all about to get ignored and they should just give up.

63.     Defendants rebuke her. She has "only two choices, to walk to the train with the officers, or to get into the ambulance."

64.     In the hopes they would get tired and leave, so she could walk to the train with her kids, Ms. Sapp turns her backs to the officer, and makes small talk with the deli worker, holding her son who is back on the counter and engaged with the worker. She jokes, "Is that your BMW outside, no it cannot be yours because it is double parked, you know, I think its mine, just give me the keys and I will take it and go home." Her two year old is amused, and she continues to play with him, and tells the deli worker to push the button so the lights will

go on, and her son can be distracted and look at the lights.  She asks him to give her the keys to show her son.  At which point, Defendant Officers are heard saying, "This is getting to be extra."

65.     They tell her she has to put her hand behind her back, and they are going to handcuff her.

66.     Defendant officer states, "We are going to take you to the hospital, and they are going to call ACS for your kids, is this the road you want to go down?"

67.     Another Defendant chimes, "Look, you got your kids with you.  Let them take you closer to your house."  Ms. Sapp refused to be taken into police custody, or remain in detention, or be walked to the train station with uniformed officers, when she did nothing wrong, and was not having a health crisis.

68.     It had now been 14 minutes since she had first entered the deli.

69.     The Doe Officers tell her the deli owner wants her out of his store.  They ask her kids, "Do you all want to go in the ambulance?"  They respond, "Ok". Defendant Officers, without permission then pick up her two year old son who was sitting with her on the deli counter. She tells them to get their hands off her kids.  Her children start screaming and crying as Defendant Officers come to pick them up, and they start yelling to the officers who were actually grabbing them, "Stop! Stop!  Please stop!  Leave me alone!  Stop!"  The children cried and screamed that they just wanted to go home.

70.     Ms. Sapp realized that unless she submitted immediately, and just went with the officers to the hospital, things would escalate further with the officers, and her kids were there, as the officers had not assisted at all- but only escalated the situation.  She did not want things to escalate and the officers to continue their unjustified actions in front of her children,

18

and to take her children from her.  Her wisdom and motherly instinct- which were there all day, continued.   She knew she had to act professionally, even though she was very scared inside. She remained brave so her children would not be worried.

71.    She was forced into police custody handcuffed, and repeated to her children, "Mommy is ok, I am ok."

72.    Ms. Sapp did not fight, she walked calmly into the ambulance, and with her hands in handcuffs behind her back, she attempted to soothe her children, who were still screaming and crying, by speaking calmly to them and trying to soothe them with her words since her hands were behind her back in handcuffs.  She just made sure her kids were close, by stating, "Bring my baby and just make sure the heat is on."

73.    Her oldest daughter crying, and sitting in the ambulance with her sibling, mom and City Defendants, screams, "Mommy!"  NYPD officer states, "Your mom is not in trouble, we are just trying to get her help, ok?"  Her daughter exclaims the obvious, "She doesn't need help!"

74.    She needed a charger to charge her phone, a phone to call a cab, or even a ride home, or just for the officers to leave her so she could walk to the train.  The children has also been explaining that all along.

75.    The Defendant Officers and EMT told Ms. Sapp that she would be going to the hospital, because it was the only place they could take her, and that they could not just let her walk away, "Now that they were involved".  Defendant Officers and EMT also told Ms. Sapp that taking her to the hospital was the best idea, because she was not permitted to be at the deli, or Domino's, and that they could not give her a ride home, or charge her phone, or assist

her in any other way.  The Defendant Officers and EMT told Ms. Sapp that the hospital was close to her home, so by going to the hospital, she would be able to get close to her home.

76.     Ms. Sapp did go home.  But not until the next day, and not with the children.  In fact, her children are still not home with her at the writing of this complaint.

77.     As is common occurrence in NYC, when one is black and low-income, rather than offer assistance, the children are taken from black and brown families and separated as ACS, NYPD, and the City of New York, often times criminalize the very people it tries to "assist".

78.     Ms. Sapp arrived at St. Barnabas in handcuffs, and her three children were taken by Defendants EMT and Officers.  That was the last she would see of her children for the next few days.

79.     In the meantime, the Defendant Officers and EMT, knowing that they had taken Ms. Sapp into custody, and the hospital, for no justifiable reason, as she was not having a mental health crisis, was not a harm to herself or others, was not threatening, had to make up reasons to cover up their actions of violating her constitutional rights.

80.     They made up information to cover their paperwork in reckless disregard for Ms. Sapp, and her life.  It is actually conscious shocking that such lies were made up to cover their unconstitutional taking of Ms. Sapp into custody.

81.     They conspired together, and did make up reasons- namely that Ms. Sapp neglected and abused her children, and that she was wandering from store to store and trying to steal cars while her children were not wearing winter coats and were told to beat up the officers.

82.     Ms. Sapp wanted her children to remain with her while she was in the ER.  When it was her turn to go to the St. Barnabas triage, she was told by employees of St. Barnabas, that they were merely going to triage her, and then bring her back with her kids.  That is not what happened.

83.     When she got to the back in the triage room, Ms. Sapp asked the St. Barnabas Doe Defendant nurse treating her what she was being held for.  In order to stop Ms. Sapp from asking questions, Ms. Sapp immediately had a needle shoved in her arm so quickly, that she was unable to stop it.

84.     Ms. Sapp remembers feeling herself drift out, and then fell asleep for many hours.  That is how much she was drugged. She does not recall anything else.

85.     She woke up at 10:00 am on Saturday morning.  She was told by the medical staff that she would be getting her children.

86.     She received her discharge papers and called the ACS number that was provided to the hospital staff to provided.

87.     Since it was a Saturday, apparently, the ACS offices were closed and nobody answered the phone. Ms. Sapp wait 48 excruciating hours crying non- stop with no word regarding her children's whereabouts.   She did not eat, sleep, or think.  It was the worst period of time of her life. She actually thought she was going to die of a heart attack.  She tried calling different attorneys- but everywhere was closed.

88.      On February 1, 2021, a Monday morning, she called the number, and was told that because her children had been in ACS custody for so long, in order to get them back, she would have to go to Court in front of a Judge.

89.     Ms. Sapp was so distraught and hurt, she could not function.  Her immense pain and suffering were intolerable. She was in shock and despair.  Family members helped her to find an attorney to represent her in family court.

90.     When Ms. Sapp finally obtained an attorney, she learned that she could not get her children back because the police and EMT and Hospital had lied, and perjured themselves, conspiring together, and putting into the report that the kids did not have coats on, and that she was mentally ill, and a threat to others.

91.     Due to this falsified report, and the statement of police that she was mentally ill and was hospitalized, and the children did not have on coats, and she was displaying erratic behavior going from store to store with her freezing and hungry children, she learned that she would have to receive mental health counseling, and psych medication before the Courts would give her, her children back.

92.     On the February 2, 2021 Petition Neglect Case filed by Defendant Natalia Richards, from ACS, stated that the children were removed from the mother's care at 5:00 pm on January 29, 20201, because there was not sufficient time to obtain an court order, and that such was necessary because, the children were neglected children under Section 1012 of the Family Court Act.

93.     Natalia Richards swore to the veracity of the statements she made in the Petition, even though she did not verify or investigate such, and such were, upon information and belief,  known to her to be false.

94.     Defendant Richard's supervisor Defendant Bly, did not only fail to make sure the information was accurate in the petition, but also added to it the unfounded and not alleged to lie that Ms. Sapp was abusing substances.

22

95.     The Petition stated that on "January 29, 2021, according to NYPD Police Officer Joseph Wazner [Ms. Sapp] was observed entering a Domino's restaurant and ran into the kitchen seeking to retrieve her cell phone in the presence of the subject children…according to the NYPD Police Officer Joseph Wazner, EMS were called to the scene and took the respondent mother to St. Barnabas Psychiatric Ward."

96.     The Petition continues, "On or about January 29, 2021, According to the NYPD Police Officer Joseph Wazner, the respondent mother instructed the subject child, NR (age 2), to assault the assisting EMS worker."

97.     The Petition then states, "On or about January 29, 2021, according to the EMS paramedic Patrick Gustama, the respondent mother was observed traveling throughout the community with the subject children T.S. (age 9), T.S, (age 8), and N.S. (age 2) wearing only sweatshirts and pajama pants.  According to EMS Paramedic Patrick Gustama, the subject children  were observed to be shivering, cold, and hungry.

98.     The Petition then states that according to a family member, Ms. Sapp's mental health history was that she does not take any prescribed Zoloft for her depression, and that there is a history of mental illness in her family.

99.     Based on only and exclusively, the above aforementioned false statements by Defendant Officers and EMT and nothing else, the Petition concludes, that Ms. Sapp "fails to provide the subject children with proper supervision or guardianship, in that she has exhibited bizarre and erratic behavior which impairs her ability to care for the subject children."  And further, that, "child was in need of immediate protective action based upon assessment of imminent danger."

100.     Despite the family court subpoena that required Body Worn Camera ("BWC") Footage of the incident, none of the BWC footage was provided by Defendant Robert Fodera, Managing Attorney of the NYPD Subpoena Litigation Unit.  Defendant Fodera signed to the fact that he had provided completed records, and would continue to provide such while incomplete.  However, the BWC footage was never provided.

101.     The entire family court petition and proceeding moved forward against Ms. Sapp, taking her kids from her custody, all because of false allegations created by Defendants.

102.     On January 30, 2021, NYPD Officer Andrew Giardino, filled and signed out a "Domestic Incident Report" falsely stating that on January 29, 2021, Ms. Sapp's 9 year old daughter, T.S. was a victim of a domestic incident, and that her mother was the suspect, and that the first words that the Victim said to the responding officers at the scene regarding the incident, was "Stop Mommy."  Further Defendant Giardino checked the box "yes" that T.S. had told him that Ms. Sapp was violently and constantly jealous of her.  This was not at all true or accurate, and was only checked because something needed to be checked in order to have the paperwork necessary to cover up for and to support the false arrest of Ms. Sapp, and to notify ACS, and its ensuing prosecution in family court, and other constitutional violations enumerated below. This was signed by NYPD supervising officer Defendant Jaycox on January 31, 2021.

103.     Further, on January 29, 2021 a "Domestic Incident Report" was filed by NYPD Defendant Lavigat, and approved by Defendant Jaycox, falsely stating that Ms. Sapp was "acting erratic" and  as a result of that, she "bought to St. Barnabas for a psych evaluation,

ACS notified and responding to St. Barnabas….Officers spoke to ACS three times regarding this case, first call with Serna, second call Emily D, and Third call with was Neil."

104.    Defendant Andrew Giardino filled out an NYPD Aided Report, approved by Defendant Tratta, stating that Ms. Sapp was emotionally disturbed, but, that she was not a harm to herself, was not a harm to others, did not physically threaten anyone, did not verbally threaten anyone, did not speak of harming herself or others, and was able to care for herself. Despite all of this, she was still taken in as an EDP, Defendant supervisors, including Lieutenant John Tratta, did not train or discipline his staff that "acting erratic" is not a reason a take someone into custody under Patrol Guide 221-13, and the Mental Hygiene Law Section 9.41 that such is based on, and that such is not appropriate.  That the standard for taking someone into custody is that they be a harm to themselves or others.

105.    Defendant Supervisors and City knew that Officers often abused the EDP policy to get overtime or to get rid of a situation they did not know how else to handle, and that such leads to constitutional violations, yet the City and supervisors never trained or disciplined its officers otherwise.

106.    Likewise St. Barnabas knows that the EDP policy requires that people come in for assessment that are not mentally ill, and than are often released. Despite such, St. Barnabas does not train its staff how to interact with the NYPD and ACS in these situations to prevent the constitutional violations from happening to people like Plaintiff, and Plaintiff here.

107.    The investigative reports written by ACS employee Damien Sellers, reiterating lies, that were either told to by NYPD to Mr. Sellers, or that he lied about himself, does not state what actually happened that night, and is apparent from watching the body worn camera

footage- that Ms. Sapp's phone ran out of charge, and that she wanted assistance in either having a ride called or a charger, or to be left alone by Officers, but instead, states the following:

(a) "Source reported that [Ms. Sapp] was entering cars that were not hers."

(b) "The mother travelled around the community with the children in five degrees Fahrenheit, for an unknown period, while the children were wearing only sweatshirts and pajama pants.  As a result, the children were cold, shivering, and hungry."

(c) "The police offered to help her get home.  [Ms. Sapp] refused their help and was still behaving erratically."

(d) "Police told [Ms. Sapp] that if she did not leave they were going to call EMS so she could be taken to a hospital."

(e) "The mother is behaving very erratically in the community while being the sole caretaker for the children. As a result, outside intervention was required to protect the children, and they are currently in need of care."

(f) "The mother was trying to get into people cars with the kids, stating they were her cars.  The mother then went into Domino's Kitchen to attempt to use their phone to call a cab. The mother then ran into the deli next door, insisting the owner give her his car keys, stating the car belongs to her. The mother stated she needs a shower and her baby needs to be changed. The mother then put [her son] on the deli counter. Them mother told her [2 year old] son to hit and beat up the police officer.  The officer offered to pay for a train for the mother, or to call an ambulance so they can go somewhere warm.  The mother was non-compliant. The police transported the mother and the children to Barnabas Hospital.  The mother may be admitted for an

evaluation.  The children are very scared and upset. The source is requesting

immediate contact from a case worker."

108.    There were also statement made, that while somewhat true, were exaggerations,

and completely out of context and were made by NYPD officers, only to justify the

unreasonable and unconstitutional taking of Ms. Sapp into custody, taking Ms. Sapp to the

hospital, and removing her children from her care:

(a) The mother put N.R. on the deli counter.

(b) The children are very scared and upset

(c) The mother told N.R. to hit the officer

(d) The mother ran into the deli next door insisting that the owner give her his car keys;

    and,

(e) Ms. Sapp demanded the cashier give her a charger.

109.    These statements led an initial analysis and hypothesis of this case to be reached

by ACS Defendants, whereby ACS Defendants concluded, "The mother has mental health

issues that impact the mother's care for the children.  Mother acts erratic while caring for the

children due to lack of mental health services."

110.    As a result of the  false allegations, the false report to ACS in order to cover up

the unconstitutional taking into custody of Ms. Sapp and her children, and the ensuing forced

mental health treatment and medication that Ms. Sapp had to take in order to be reunited with

her children, Ms. Sapp, did in fact start to decline in her mental health, and she did, in fact,

start to become even more antagonistic with ACS and very distrusting of them and the police.

This in turn led to ACS criminalizing and demonizing Ms. Sapp even further, and keeping

her children from her, up to this day, they are all three in foster care.

111.    Her court appointed-therapist and psychiatrist confirmed that she does not, in fact, have a mental health disability.  However, due to losing her children, she was diagnosed with being depressed and having anxiety, and given medication in order to zombie out these amplified emotions of the family court case.  She is required to get monthly injections of psych medications that have decreased her quality of life and *joie de vivre*.

112.    In the meantime, while in ACS custody, Ms. Sapp's 7 year old was diagnosed with suicidal ideations, because he wanted to be home with his mom.  He was put in a mental facility for two weeks, because he stated if he did not go home, he would kill himself, and he also was hit by his male foster parent.

113.    All of this furthered the pain of separation that Ms. Sapp has felt, and all of these ensuing events are damages caused by Defendants' actions.

114.     Defendant Officers filled out blatantly false and misleading NYPD paperwork, and such was done to cover up the unlawful detention and arrest, an abuse of process, of taking Ms. Sapp into custody, in order to get rid of the immediate situation, and increase Defendant Officers' own overtime- as they had to spend hours at the hospital and filling out paperwork for this false detention.  This furthered the unconstitutional actions of NYPD officers.

115.    Supervising Officers signed off on the false and exaggerated reports.

116.    Defendant Officers called ACS, filled out false domestic incidents reports, made up facts to ACS, in order to have Ms. Sapp's children taken from her, and to cover up for their unconstitutionally taking her into custody in the first place.

117.    ACS blatantly and without any independent investigation just regurgitated the lies, and added to them, all in an effort to violate Ms. Sapp's constitutional rights.

118.    Ms. Sapp, a compassionate and loving single mother, who managed her household, and loved her kids with all of heart, and with grace and calm, had her children taken from her by Defendants in order, but not exclusively, to cover up their illegal actions.

119.    Defendant Officers lied on the Domestic Incident Report, committing perjury on a charging instrument for ACS purposes, stating that Ms. Sapp was essentially abusing her daughter by being violently and excessively jealous of her.

120.    Any one of the supervising sergeants, the lieutenants, reviewing the reports, or the ACS workers who wrote up the ACS petition, could have watched the Body Worn Camera footage, which refuted Defendant Officers' fabricated justification for taking Ms. Sapp into custody with her children and forwarding false abuse and neglect fabrications against her.

121.    However, it does not appear that anyone reviewed the Body Worn Camera footage worn by Defendant Officers at the scene, even though they are required to watch such.

122.    Ms. Sapp had her children emergency removed from her by ACS Defendants, was charged by ACS, based on Defendant Officers' exaggerated and self-serving fabrication of what happened when officers abused their authority and took Ms. Sapp into custody.

123.    ACS charged Ms. Sapp with the neglect of her children, and her children were emergency removed from her care.

124.     In fact, there was no evidence, and no reasonable basis to believe, that Plaintiff had at any time engaged in neglect.

125.    This incident only occurred because Plaintiff was with her three children and needed to charge her phone, during the height of COVID, and there was nobody who would

assist her to just charge her phone, or call her a cab, or allow her to leave unconstitutional police custody, so she could just take the train home with her kids. Defendant Officers took offense of Ms. Sapp's "non compliant' attitude, conspired, and punished her for talking back to the officers, and not wanting to go with them into custody.

126.    No Body-worn Camera footage was provided to Ms. Sapp's family court attorney, although a subpoena was served demanding all NYPD materials, including , "NYPD body camera footage", all "unredacted electronic recordings" and all other forms of recording, documentation, statements, interactions, and the like.

127.    Ms. Sapp's counsel never received a copy of the Body Worn Camera footage on January 29, 2021, containing this alleged attempt to steal cars, assault officers, keep her kids cold without jackets in 5 degree weather, walk around the neighborhood erratically, and violently threaten her children. This would have exonerated her.

128.    Ms. Sapp's family court attorney never received any video of the incident, until present counsel sent a FOIL request for such in January of 2023, and such was produced in late August of 2023.

129.    Mr. Sapp wondered if- absent any video documenting the events before she was taken into custody- anybody would believe her, an "EDP". She did not think the family court judge, or anybody- absent a video- would take her word, "an EDP" that was erratically wondering the streets and trying to break into cars with her children undressed, violent towards her children, and attempting to have her two year old assault an officer. She wondered if a family court judge would give her the children, believing that the allegations made by Defendants Officers, and relied on, and not independently verified or investigated by ACS Defendants.

130.    Ms. Sapp thought about her mental health, and her newfound status as an EDP, and how it had already been used against her, like it had been to justify the taking into custody, and other separations of parents and their children by ACS and family court.   She remembered how other young black mothers never got justice, and their families were torn apart, and how the officers who had lied about the charges against them, had never even been charged or held accountable.

131.    She reasoned that -without any documentation or evidence- like a video or BWC, there was no way she would get justice in the prosecution against her. She doubted anyone would believe her, and if she could just not oppose the family court petition, she may be able to save her family against a family court  system that had numerous times demonstrated its bias towards people like herself.

132.    Despite having not committed any of the offenses of neglect for which she was maliciously charged, and based on demonstrably false allegations relayed by Defendant Officers, and the lack of any apparent evidence to the contrary, Plaintiff hoped to cooperate and get her children back by using the family court system.

133.    On August 7, 2023,  Plaintiff was provided with a copy of the body worn camera videos. They showed her children fully dressed in warm winter coat children, being loved and cared for by their mother while she was being unlawfully detained by police officers who antagonized her and violated her constitutional rights, and then covered it up by making her appear "erratic" and abusive in their ensuing reports and paperwork, despite it being clear on the BWC that she was not acting erratically or in any way a person who would fall under Mental Health and Hygiene Law 9.41.

134.    In noncompliance with New York Police Department policy (see Patrol Guide 212-213, which states that "all BWC videos related to an arrest" [must be] "provided to … the appropriate District Attorney's office by utilizing the 'Share' function in the video management system"), Defendant Officers intentionally withheld body worn camera footage that implicated them for the false arrest of Ms. Sapp and deprivation of her constitutional rights.

135.    Supervisory Defendants either conspired with Defendant Officers to avoid releasing the body worn camera footage detrimental to their interests for the subpoena or were inadequately trained to supervise, correct and discipline Defendant Officers' intentional noncompliance with the NYPD Patrol Guide.

136.    St. Barnabas Hospital and its John Doe employees, also, did not once ask questions of the officers to properly assess the veracity of their statements, or question their authority.  Despite the children being medically cleared by St. Barnabas, and the children explaining what had happened about their mom and the charge, and having no phone, St. Barnabas still kept the mother for overnight care, even though they could have released her immediately, as it was evident from her behavior and her and her children's accounting that there was nothing wrong with her.

137.    Defendants signed the police paperwork, thereby swearing to the veracity of its allegations, under penalty of perjury, despite knowing that there was no truth to those allegations whatsoever, that the allegations against Plaintiff were false and completely fabricated, that there was never any legal basis to have detained or arrested Plaintiff, and that there was no legal basis to take her to the hospital and claim that the children had reported she abused them, or that she was in any way neglecting her children.

138.     There was no probable cause that Plaintiff Sapp had committed any neglect of her children, or that she was a threat to herself, others, or her children.

139.     Upon information and belief, Defendants arrested and imprisoned Plaintiff despite knowing that there was no legal justification for doing so in order to justify their own actions, and cover up their abuse of the EDP policy, and to get back at Plaintiff for her non-compliance and her talking back to the Officers rather than just going to the hospital, even though she did not need to go.

140.     Upon information and belief, Defendant CITY of New York, has both a custom of editing and withholding body-worn camera video, and, was made aware of these edits and with-holdings, both through newspaper articles, the CCRB report, and other lawsuits, and has failed to address this pattern

141.     The City of New York, through the NYPD, was aware of the redaction and withholding of body worn camera footage but were deliberately indifferent to it and failed to train, supervise, or discipline officers who were not submitting their body-worn camera footage, or redacting where there was no legal or procedural justification for the redaction.

142.     One of the purposes of a body worn camera is to deter officers from engaging in unconstitutional conduct.  The rationale being that body worn cameras increase transparency, and ergo, accountability.  There is no transparency where the footage is with-held or redacted to spoil any evidence of misconduct.

143.     Defendant Officers did not submit the footage of their misconduct.

144.     The footage of their misconduct was not provided to the NYPD subpoena office, as per the written patrol guidelines (see, 212-123 2018 version section 31, and 2020 version line 21).

33

145.    The City of New York is deliberately indifferent to the absence of discipline or oversight.

146.    Defendant officers knew they would not have to submit the unedited body-worn footage cameras in full, because they were aware of the City of New York's failure to train, supervise, or discipline officers for such acts.

147.    The practice of editing or not releasing body worn camera footage in order to hide illegal acts by the NYPD Officers, and the lack of supervision over such actions, has been routine, and found in all levels of the NYPD. Such actions, by the wanton hiding and editing, fabricating evidence to twist the narrative, is a direct consequence of the lack of supervision and training of NYPD Officers to submit and release unredacted BWC footage. It is because of such policy and custom, which is objectively deliberately indifferent, that the NYPD Defendant Officers committed the unlawful actions they did here.  Such lack of supervision and training, among other things, is an implicit agreement to the fact it is being done.

148.    Defendant Officers knew that their supervisors coalesced in the hiding of segments of video, the very accountability measures put in place to prevent illegal conduct by state actors.

149.    Plaintiff was injured.

150.    This withholding of video is one NYPD policy makers and supervisors had been aware, as it has been on going issue since the introduction of the BWC's.  These issues have been reported many times, by different news outlets, (See, https://gothamist.com/news/nypd-body-cameras-dont-stop-officers-from-making-unlawful-stops-study-shows,

https://www.gothamgazette.com/city/9723-new-body-camera-policy-nypd-controls-video-narrative)

151.     It has oft been reported that the NYPD is not giving critical bodycam footage to officials investigating abuse (See, https://www.propublica.org/article/the-nypd-isnt-giving-critical-bodycam-footage-to-officials-investigating-alleged-abuse) "the department's refusal to share evidence of its own officers' potential misconduct isn't an aberration. It's routine. Despite its legal obligations, the NYPD has been withholding significant evidence and undermining investigations of alleged abuse…. And, critically, it often doesn't produce body-worn camera footage."

152.     The BWC issue is not the only policy failure here, another is the EDP policy, which, on both its face and as it is practiced and was practiced here, permits the taking into custody of people who are not a threat to themselves or others, or not suicidal.

153.     Defendants used that policy to violate Ms. Sapp's constitutional rights.

154.     As highlighted in numerous complaints, and the class action, Baerga vs. City of New York, this policy has a long known history of violating the constitutional rights of NYC residents, and yet, it is still being used and abused by the NYPD.

155.      All Defendants agreed, cooperated, participated, and conspired with their co-Defendants herein to assist in and effectuate Plaintiff's unlawful arrest, excessive force, malicious abuse of process, and malicious prosecution for crimes Officers knew that he did not commit, and in so doing deprived Plaintiff of her rights, privileges and immunities secured by the Constitution of the United States, including, but not limited to, her rights under the Fourth and Fourteenth Amendments to the U.S. Constitution to be free from unreasonable searches and seizures and to due process of law.

156.     Defendants made these false allegations against Plaintiff with actual malice, and out of spite and ill will, and with retributive purpose.

157.     Defendants engaged in the above-described conduct intentionally and/or with deliberate indifference to Plaintiff's constitutional and civil rights.

158.     All Defendants acted in concert to lodge these false allegations against Plaintiff Greene and initiate a prosecution against him for offenses they knew he did not commit.

159.     Upon information and belief, Defendants arrested and imprisoned Plaintiff despite knowing that there was no legal justification for doing so in order to justify their own actions, and cover up their use of force against Plaintiff, and to put pressure on Plaintiff

160.     As a result of the foregoing, Plaintiff sustained, *inter alia*, deprivation of her constitutional rights; loss of enjoyment of life; loss of liberty; loss of basic; fundamental human contact; loss of natural contact with her children; loss of natural contact with his family; loss of the natural family role she played within his family as mother; physical injuries; personal injuries; emotional injuries; loss of income; loss of economic opportunity; pain and suffering; severe mental anguish, emotional distress, fear and lack of privacy, all necessitating psychiatric or therapeutic counseling, inadequate medical care; humiliation, indignities and embarrassment; degradation; injury to reputation; restrictions on or total deprivations of all personal freedoms; liberties and entitlements, including but not limited to diet, sleep, personal contact, educational opportunity, vocational opportunity, athletic opportunity, hobbies, religious fulfillment, personal fulfillment, sexual activity, family relations, marital relations, reading, movies, travel, driving, enjoyment, and expression. Furthermore, as a direct result of his unjust conviction and imprisonment, and the excessive

force used against her, many of the effects of these disabilities and impairments continue to plague Plaintiff to this day, and will continue to plague Plaintiff for the rest of her life.

## FIRST CLAIM FOR RELIEF
### EXCESSIVE FORCE IN VIOLATION OF 42 U.S.C. § 1983 AND
### THE FOURTH AND FOURTEENTH AMENDMENTS OF THE CONSTITUTION

161.    The Plaintiff incorporates by reference the allegations set forth in all previous Paragraphs as if fully set forth herein.

162.    The level of force employed by Defendants against Plaintiff was objectively unreasonable and violated Plaintiff' constitutional rights.

163.    As a result of the aforementioned conduct of the Defendants, Plaintiff was subjected to excessive force and sustained physical and emotional injuries.

## SECOND CLAIM FOR RELIEF
### FALSE ARREST IN VIOLATION OF 42 U.S.C. § 1983 AND
### THE FOURTH AND FOURTEENTH AMENDMENTS OF THE CONSTITUTION

164.    The Plaintiff incorporates by reference the allegations set forth in all previous Paragraphs as if fully set forth herein.

165.    Plaintiff was subjected to an illegal, improper and false arrest by Defendants, and taken into custody and caused to be falsely imprisoned, detained, and confined, without any probable cause, privilege or consent.

166.    As a direct and proximate result of the foregoing, Plaintiff was placed in substantial and prolonged fear for her safety, her liberty was restricted for an extended period of time, she was subjected to handcuffs and other physical restraints, without probable cause or other lawful justification, in violation of the Fourth and Fourteenth Amendments of the

Constitution of the United States and suffered and will continue to suffer injury and damages as a result, including, inter alia, physical and mental pain and suffering, and mental anguish.

### THIRD CLAIM FOR RELIEF
### MALICIOUS PROSECUTION IN VIOLATION OF 42 U.S.C. § 1983 AND THE FOURTH AND FOURTEENTH AMENDMENTS OF THE CONSTITUTION

167.     The Plaintiff incorporates by reference the allegations set forth in all previous Paragraphs as if fully set forth herein.

168.     Plaintiff Juandisha Sapp was prosecuted by the ACS, based on the fabricated information that Defendants had provided to the ACS, and ACS' lack of any kind of investigation on the case before charging and prosecuting Ms. Sapp.

169.     There was no probable cause that Plaintiff Sapp had committed any of these offenses or neglected her children.

170.     Defendants did not make a complete and full statement of facts to ACS, and withheld exculpatory evidence from ACS for charges against Plaintiff.

171.     Defendants were directly and actively involved in the continuation of family court proceedings against Plaintiff for charges against Plaintiff.

172.     Defendants acted with malice in continuing family court proceedings against Plaintiff.

173.     Defendants misrepresented and falsified evidence throughout all phases of the family court proceeding.

### FOURTH CLAIM FOR RELIEF
### MALICIOUS ABUSE OF PROCESS IN VIOLATION OF 42 U.S.C. § 1983

174.     The Plaintiff incorporates by reference the allegations set forth in all previous Paragraphs as if fully set forth herein.

175.     Defendants issued legal process to place Plaintiff under arrest.

176.      Defendants arrested Plaintiff in order to achieve a collateral objective of covering up for their improper taking of Plaintiff under the EDP policy, and violating her constitutional rights, beyond the legitimate ends of the legal process.

177.      Defendants acted with intent to do harm to Plaintiff without excuse or justification.

178.      As a direct and proximate result of the misconduct and abuse of authority described above, Plaintiff has suffered and will continue to suffer injury and damages, including, inter alia, physical and mental pain and suffering, and mental anguish.

**FIFTH CLAIM FOR RELIEF**
**FAILURE TO INTERVENE IN VIOLATION OF 42 U.S.C.§ 1983**

179.      The Plaintiff incorporates by reference the allegations set forth in all previous Paragraphs as if fully set forth herein.

180.      Each and every individual defendant had an affirmative duty to intervene on Plaintiff' behalf to prevent the violation of his constitutional rights.

181.      The individual Defendants failed to intervene on Plaintiff' behalf to prevent the violation of her constitutional rights incurred by the use of the false arrest against her, the ensuing malicious prosecution, and excessive force, despite having had a realistic opportunity to do so.

182.      As a result of the aforementioned conduct of the individual Defendants, Plaintiff's constitutional rights were violated.

183.      The Plaintiff incorporates by reference the allegations set forth in all previous Paragraphs as if fully set forth herein.

184.      Defendants agreed, cooperated, participated, and conspired to assist in and effectuate plaintiff's unlawful detention, arrest, imprisonment, and malicious prosecution for

crimes she did not commit, and in so doing deprived plaintiff of her rights, privileges and

immunities secured by the Constitution of the United States, including, but not limited to, her

rights under the Fourth and Fourteenth Amendments to the U.S. Constitution to be free from

unreasonable searches and seizures and to due process of law.

185.    As a direct and proximate result of the misconduct and abuse of authority

described above, Plaintiff has suffered and will continue to suffer injury and damages,

including, inter alia, physical and mental pain and suffering, and mental anguish.

**SIXTH CLAIM FOR RELIEF**
**DUE PROCESS OF LAW AND COVER-UP CLAIM IN VIOLATION OF 42**
**U.S.C.§ 1983**

186.    The Plaintiff incorporates by reference the allegations set forth in all previous

Paragraphs as if fully set forth herein.

187.    In all of the reports of the incident, and all the subsequent hearings regarding the

underlying incident and in all of the papers produced, they were all filled with the

fabrications, cover up and lies perpetrated by Defendants.

188.    There was ample evidence that showed that Ms. Sapp had been wrongly taken

into custody by Defendant Officers.

189.    Evidence was fabricated and made up by Defendants, including false statements

on the reports and to other agencies, to recreate/fabricate/manufacture the cover up of the

crime.

190.    This cover up was performed by Defendants in order to cover up for the unlawful

arrest and use of excessive force against Ms. Sapp, and has now made it almost impossible

for Plaintiff to litigate her neglect and family court case claims, making it more difficult for

Ms. Sapp to access to the Courts.

191. In the reports that were filled out by Defendants, they reiterated the same lies created by Defendants regarding the behavior of Plaintiff and they all tainted Plaintiff's family court prosecution.

192. The tainting and manufacturing and hiding of evidence in such due process proceedings is abhorrent in our society, and shocks the conscience.

193. A basic tenet of due process is the ability to confront notoriously unreliable evidence.

194. Defendants knew their statements and actions were unlawful, contradictory and unbelievable.

195. Such conduct is deliberately indifferent and amounts to a violation of due process of law as guaranteed by the Fourteenth Amendment.

196. The Defendants' many failures caused the injuries to Plaintiff.

197. As a direct and proximate cause of the Defendants' actions, Plaintiff suffered emotional and physical torture, injury, and trauma, immense pain and suffering, humiliation, and terror.

## SEVENTH CLAIM FOR RELIEF
### (CONSPIRANCY PURSUANT TO 42 U.S.C. § 1985(2)-OBSTRUCTING JUSTICE)

198. Above paragraphs are stated herein by reference.

199. Defendants conspired with each other for the purpose of impeding, hindering, obstructing, or defeating, in any manner, the due course of justice. Here, Defendants hid evidence and fabricated evidence, a criminal activity.

200. None of these acts were in any way related to corporate policy or management decision, but were instead to further the criminal acts of Defendants.

201.     Defendants also further assisted in and affirmatively created the danger and ensuing deprivation of Plaintiffs' Equal Protection of the Law by inciting and allowing ACS to take Ms. Sapp's children from her. Defendant Officers were conspiring and/or communicating that such actions directed towards Plaintiff would be acceptable, and that such actions by other defendants towards Plaintiff were implicitly condoned.

202.     Defendants cooperated together and hid their actions, and were not only creating and assisting in such a situation, but were deliberately indifferent to the rights of the Plaintiff to a degree that shocks the conscience.

203.      Defendants' obstruction of justice, knowledge of obstruction, in addition to their deliberate indifference, caused Plaintiff's injuries.

204.     Defendants agreed, cooperated, participated, and conspired to assist in and effectuate plaintiff's unlawful force, detention, arrest, imprisonment, and malicious prosecution for offenses, and family court neglect, that she did not commit, and in so doing deprived plaintiff of her rights, privileges and immunities secured by the Constitution of the United States, including, but not limited to, her rights under the Fourth and Fourteenth Amendments to the U.S. Constitution.

205.     Defendant Officers conspired with each other for the purpose of impeding, hindering, obstructing, or defeating, in any manner, the due course of justice.

206.     None of these acts were in any way related to corporate policy or management decision, but were instead to further the criminal acts of Defendants.

207.     Defendants cooperated together and hid their actions, and were not only creating and assisting in such a situation, but were deliberately indifferent to the rights of the Plaintiff to a degree that shocks the conscience.

208.    Defendants' obstruction of justice, knowledge of obstruction, in addition to their deliberate indifference, caused Plaintiff's injuries.

## EIGHTH CLAIM FOR RELIEF
## SUPERVISORY LIABILITY FOR DEPRIVATION OF RIGHTS UNDER THE UNITED STATES CONSTITUTION AND 42 U.S.C. 1983

209.    The Plaintiff incorporate by reference the allegations set forth in all previous Paragraphs as if fully set forth herein.

210.    By their conduct in failing to remedy the wrongs committed by employees of the The City of New York under their supervision; in failing to properly train, supervise, or discipline employees of the The City of New York under their supervision; and in directing employees under their supervision, Defendants, acting under the color of state law and in their individual and official capacities and within the scope of their employment, caused damage and injury in violation of Plaintiff' rights guaranteed under 42 U.S.C. § 1983, and the United States Constitution, including its Amendments.

211.    As a result of the foregoing, Plaintiff was deprived of her liberty, suffered specific and serious bodily injury, pain and suffering, emotional distress and psychological injury, great humiliation, costs and expenses, and was otherwise damaged and injured.

## NINTH CLAIM FOR RELIEF
## *MONELL* CLAIM AGAINST CITY DEFENDANT AND ST. BARNABAS UNDER 42 U.S.C. 1983

212.    The Plaintiff incorporate by reference the allegations set forth in all previous Paragraphs as if fully set forth herein.

213.    The individual defendants, singly and collectively, while acting within the scope of their employment and authority and under color of state law, engaged in conduct that

constituted customs, policies, practices, procedures, rules, or usages of the NYPD and their specific precinct(s) forbidden by the Constitution of the United States.

214.    The foregoing customs, policies, practices, procedures, rules, and usages include, but are not limited to, using the EDP policy and designation to put someone under arrest so as to not have to properly assist that person with the services they need.  This also includes, without limitation:

    a.  Routinely with-holding video to different agencies, including ACS, or the District Attorney's Office, that shows officers arresting an individual unlawfully and without probable cause;

    b.  Ignoring evidence calling into question or directly or indirectly repudiating above mentioned measures;

    c.  Failing to perform basic supervision and oversight of videos, to catch and discipline officers who engage in such conduct;

    d.  Encouraging and directing, through policy and/or practice, its law enforcement officers to destroy, edit, and withhold video evidence that would reveal unconstitutional conduct;

    e.  Permitting the taking into custody of people, under the theory of "EDP" even though they are not a threat to themselves or others, and are willing to leave voluntarily, and are not in any way dangerous to anyone.

    f.  Not disciplining or training their Officers when the EDP policy takes people who do not qualify under 9.41 into custody.

    g.  Failing to discipline and train their officers when they lie and are dishonest and fill out paperwork intentionally dishonestly.

215.    Defendant CITY has recklessly and with deliberate indifference failed to provide adequate training and standards and policies and practices for its police officers. Such thus leads to recklessly and deliberately indifferent oversight which consciously permits the destruction of evidence, and leading to the arrest, and prosecution of individuals who are innocent of any wrongdoing in a related crime or crimes of which the individual is accused, arrested, and prosecuted.

216.    The abuse to which plaintiff was subjected was consistent with an institutionalized practice of the NYPD, which was known to and ratified by defendant CITY.

217.    Despite knowledge of these institutionalized practices, defendant CITY has at no time taken any effective action to prevent NYPD personnel from continuing to engage in this type of misconduct.

218.    Defendant CITY had prior notice of the vicious propensities of defendants, but took no steps to train them, correct their abuse of authority, or to discourage their unlawful use of authority.

219.    The failure of defendant CITY to properly train defendants included the failure to instruct them in applicable provisions of the State Penal Law of the State of New York, federal and state constitutional limitations, and the proper and prudent use of force and arrests.

220.    Defendant CITY authorized, tolerated as institutionalized practices, and ratified the misconduct detailed above by, among other things:

        a. Failing to properly discipline, train, restrict, and control employees, including defendants, known to be irresponsible in their dealings with citizens of the community;

b.  Failing to take adequate precautions in the training, hiring, promotion, and retention of police personnel, including specifically defendants herein;

c.  Failing to establish or assure the functioning of a bona fide and meaningful departmental system for dealing with complaints of police misconduct, but instead responding to these types of complaints with bureaucratic power and official denials calculated to mislead the public.

d.  That the failure to supervise and/or train by defendant CITY of defendants herein rose to the level of deliberate indifference to the consequences of its actions, and indifference to plaintiff's rights, privileges and immunities secured by the Constitution of the United States of America, inter alia, plaintiff's Fourth and Fourteenth Amendment rights.

221.    The NYPD has inadequately screened, hired, retained, trained, and supervised its employees, including the individual defendants herein, to respect the constitutional rights of those individuals with whom NYPD police officers come in contact.

222.    The foregoing customs, policies, practices, procedures, rules, and usages constituted deliberate indifference to plaintiff's safety, well-being, and constitutional rights.

223.    The foregoing customs, policies, practices, procedures, rules, or usages were the direct and proximate cause of the constitutional violations suffered by plaintiff.

224.    The foregoing customs, policies, practices, procedures, rules, or usages were the moving force behind the constitutional violations suffered by plaintiff.

**TENTH CLAIM FOR RELIEF**
**VIOLATION OF AND RETALIATION FOR THE EXERCISE**
**OF RIGHTS TO FREE SPEECH**

225.    The Plaintiff incorporates by reference the allegations set forth in all previous Paragraphs as if fully set forth herein.

226.    By the actions described above, Defendants violated, and retaliated for the exercise of the free speech of Plaintiff.  The acts and conduct of the Defendants were the direct and proximate cause of injury and damage to plaintiff and violated his statutory and common law rights as guaranteed by the laws and Constitution of the State of New York.

227.    As a result of the foregoing, Plaintiff was deprived of her liberty and property, experienced pain and suffering, emotional injury, costs and expenses, and was otherwise damaged and injured.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands the following relief jointly and severally against all the Defendants:

a.  Compensatory damages in an amount to be determined at trial;

b.  Punitive damages in an amount to be determined at trial;

c.  Attorney's fees pursuant to 42 U.S.C. § 1988;

d.  An award of Plaintiff's costs of suit;

e.  Pre-judgment and post-judgment interest;

f.  Such other relief as this Court deems just and proper.

Dated this 29th day of January, 2024

Respectfully Submitted,

_____/s/_____
P. Jenny Marashi (PM0916)
Marashi Legal

930 Grand Concourse, #1E
Bronx, NY 10451
(917) 703-1742
Marashi.legal@gmail.com
Attorney for Plaintiff